# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

November 18, 2015

Lyle W. Cayce
Clerk

No. 14-40459

RAMONA HINOJOSA, Individually as a Wrongful Death Beneficiary and as the Heir to the Estate of Albert Hinojosa,

> Plaintiff – Appellee,

v.

BRAD LIVINGSTON; RICK THALER; WILLIAM STEPHENS,

> Defendants – Appellants.

Appeal from the United States District Court
for the Southern District of Texas

Before REAVLEY, JONES, and ELROD, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

In this interlocutory appeal, Brad Livingston, Rick Thaler, and William Stephens (collectively "Defendants") challenge an order of the district court that deferred ruling on their motion to dismiss on the basis of qualified immunity and ordered limited discovery. Because the district court correctly concluded that the complaint was sufficient and that further factual development was needed to rule on Defendants' qualified immunity defense, and because the discovery that the district court ordered was narrowly tailored to the facts needed to rule on the defense, we lack jurisdiction over this appeal and dismiss.

No. 14-40459

**I.**

On August 29, 2012, Albert Hinojosa died of complications from heatstroke while he was incarcerated at the Garza West Unit of the Texas Department of Criminal Justice ("TDCJ").[1] Shortly after midnight, an inmate reported that Hinojosa had fallen out of his bed and was convulsing. A correctional officer found Hinojosa on the floor of his cell. He was unresponsive, and his skin was hot to the touch. The officer's supervisor called for an ambulance, but Hinojosa was pronounced dead twenty minutes after it arrived. An autopsy concluded that he "was vulnerable to the effects of environmental hyperthermia due to pre-existing natural disease, and likely suffered a seizure followed by fatal cardiac arrhythmia."

Hinojosa's mother and sole heir, Ramona Hinojosa, sued numerous prison officials and employees, the TDCJ, the University of Texas Medical Branch ("UTMB"), and an official of UTMB, alleging that they were responsible for her son's death.[2] She asserted claims under 42 U.S.C. § 1983, the Americans with Disabilities Act of 1990 ("ADA") and the ADA Amendments Act, 42 U.S.C. § 12131 *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. § 794. Only the § 1983 claim is at issue in this appeal. Hinojosa's mother premised her § 1983 claim on an asserted Eighth Amendment violation, alleging that the conditions in which Defendants housed Hinojosa posed a substantial risk of serious harm, and that Defendants acted with deliberate indifference toward Hinojosa's health and safety needs.

---

[1] For purposes of this appeal, we take the complaint's factual allegations as true and view them in the light most favorable to the plaintiff. *See Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 252 (5th Cir. 2005).

[2] Ramona Hinojosa passed away during the pendency of this appeal, and Rene Arturo Hinojosa—Ramona's grandson and Albert's nephew—is now pursuing this suit as representative of Ramona's estate.

2

No. 14-40459

The complaint alleges that at the time of his death, Hinojosa was forty-four years old and obese, and he suffered from hypertension, diabetes, depression, and schizophrenia—conditions that made him susceptible to heat-related illnesses. According to the complaint, Hinojosa took various medications for his ailments, a common side-effect of which is that they render patients more vulnerable to the heat. The complaint alleges that, as reflected in TDCJ policies, Defendants knew that these conditions and medications put affected prisoners at an increased risk of heat-related illness. Indeed, according to the complaint, from 2007 until Hinojosa's death, thirteen other men had died from heat-related causes in TDCJ prisons. Many of these individuals allegedly suffered from ailments—and had been prescribed medications—similar to Hinojosa's. Moreover, the complaint alleges that like many of the other deceased prisoners, Hinojosa had recently been moved from a climate-controlled county jail,[3] and he died shortly after his arrival at a non-air-conditioned TDCJ transfer facility before he had much time to acclimatize to the high temperatures of the new environment. The complaint alleges that TDCJ policies acknowledged the importance of acclimatization to reduce the risk of heatstroke, but TDCJ did not have any housing assignment policy for newly arrived inmates to help them acclimatize.

According to the complaint, although certain parts of the Garza West Unit have air conditioning, those portions used to house inmates do not, and the Unit's windows are sealed shut. The complaint alleges that summer temperatures inside the Unit routinely exceed 90°F, and even 100°F. The complaint specifically alleges that the day before Hinojosa died, the temperature at the Unit surpassed 100°F, and in twenty-seven of the twenty-

---

[3] By law, the indoor temperature of Texas county jails generally must be kept between 65°F and 85°F. *See* 37 Tex. Admin. Code §§ 259.160, 260.154.

3

eight days preceding his death, the temperature rose above 95°F. According to the complaint, while TDCJ policies dictate that inmates with heat-sensitive conditions not work or recreate in environments where the apparent air temperature is 95°F or higher, they do not address housing assignments for such inmates. In addition, according to the complaint, inmates sometimes wait up to ten days to receive their intake physical examination after their transfer to TDCJ custody. These physicals provide the first opportunity to detect and treat inmates' heat-sensitive medical problems, and the complaint alleges that TDCJ will not allow newly arrived inmates to labor outdoors until they have received an intake physical. But what is true for work is not true for housing, the complaint asserts. According to the complaint, before they receive their intake physicals, newly arrived inmates may not labor outdoors in high temperatures, but they are nonetheless housed in high indoor temperatures along with the rest of the inmate population.

The complaint alleges that despite their awareness of numerous prior heat-related fatalities, Defendants took no corrective action. Under policies that Defendants allegedly implemented and could have changed, no housing accommodation was made for newly arrived inmates or inmates with heat-sensitive medical conditions. The complaint asserts that Thaler and Stephens routinely reviewed reports of heat-related injuries and deaths and regularly discussed those incidents in meetings with their deputies. According to the complaint, however, they made no changes to inmates' accommodations, failed to ensure that inmates timely received intake physicals, and failed to implement any other protective procedures. Livingston also took no action, the complaint alleges, even though he approved cooling measures for barns housing pigs that TDCJ raises for slaughter. The complaint also alleges that Livingston took part in the decision not to employ medical staff at the Garza West Unit during night hours, and that all three supervisory Defendants were

responsible for an alleged lack of adequate training that correctional officers received.

## II.

Defendants moved to dismiss the § 1983 claim against them on the basis of qualified immunity. They argued that as the top three security administrators of TDCJ,[4] they were not personally responsible for—and did not personally participate in—any decisions regarding Hinojosa's housing or medical needs, and they did not violate clearly established law.

After hearing argument on the motion, the district court orally denied it from the bench. In its later-issued written order explaining its reasoning, the district court held that the complaint alleged facts which, if true, would permit the inference that the defendants were liable for the alleged harm and would defeat the qualified immunity defense. However, the district court determined that further factual development was necessary for it to rule on the defense, because "[t]here remain significant questions to be answered as to the details of the TDCJ Defendants' knowledge, actions, omissions and/or policies in regards to TDCJ prison operations in times of extreme heat." Therefore, the district court deferred ruling on the qualified immunity defense and ordered discovery "limited to the personal knowledge and personal conduct of each Defendant as it relates to Albert Hinojosa and the circumstances leading to his death." Defendants then initiated this interlocutory appeal.

---

[4] As detailed in the complaint, at the time of Hinojosa's death, Brad Livingston was the executive director of TDCJ, Rick Thaler was the director of TDCJ's Correctional Institutions Division, and William Stephens was the deputy director of the Correctional Institutions Division. The complaint asserts that in their capacities, Livingston, Thaler, and Stephens exercised administrative authority over all TDCJ employees working in TDCJ institutions, including those working in the Garza West Unit.

No. 14-40459

### III.

The parties disagree over whether we have jurisdiction to review the district court's order. Under 28 U.S.C. § 1291, we have jurisdiction to review "final decisions" of the district courts in our circuit. Generally, this class of decisions "does not include discovery orders." *Backe v. LeBlanc*, 691 F.3d 645, 647–48 (5th Cir. 2012). However, the Supreme Court has interpreted § 1291 to include a grant of authority to review a "small class" of collateral orders traditionally considered non-final. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545–47 (1949). Under this collateral order doctrine, we have jurisdiction under § 1291 to entertain appeals from decisions that "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] [are] effectively unreviewable on appeal from a final judgment." *Texas v. Caremark, Inc.*, 584 F.3d 655, 657–58 (5th Cir. 2009) (alterations in original) (quoting *Will v. Hallock*, 546 U.S. 345, 349 (2006)). A district court's order denying qualified immunity is one such order. *Zapata v. Melson*, 750 F.3d 481, 484 (5th Cir. 2014); *Backe*, 691 F.3d at 648. So too is an order deferring the district court's qualified immunity ruling and providing for limited discovery if the order fails to comply with our precedent, because "[o]ne of the most salient benefits of qualified immunity is protection from pretrial discovery." *Backe*, 691 F.3d at 648. If, however, such an order complies with our precedent, we lack jurisdiction to review it. *Zapata*, 750 F.3d at 485; *Backe*, 691 F.3d at 648.

Thus, to determine whether we have jurisdiction over this interlocutory appeal, we must determine whether the district court's order complied with our precedent for issuing such orders. "[T]his court has established a careful procedure under which a district court may defer its qualified immunity ruling if further factual development is necessary to ascertain the availability of that defense." *Backe*, 691 F.3d at 648. First, the district court must determine "that

6

the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity." *Id.* (quoting *Wicks v. Miss. State Emp't Servs.*, 41 F.3d 991, 994 (5th Cir. 1995)). "Thus, a plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Id.* When reviewing a complaint that meets this standard, the district court may defer its qualified immunity ruling and order limited discovery if "the court remains 'unable to rule on the immunity defense without further clarification of the facts.'" *Id.* (quoting *Lion Boulos v. Wilson*, 834 F.2d 504, 507 (5th Cir. 1987)). Such a discovery order must be "narrowly tailored to uncover only those facts needed to rule on the immunity claim." *Id.* (quoting *Lion Boulos*, 834 F.2d at 507–08). "[W]e may review the order under the collateral order doctrine when a district court fails to find first that the plaintiff's complaint overcomes a defendant's qualified immunity defense, when the court refuses to rule on a qualified immunity defense, or when the court's discovery order exceeds the requisite 'narrowly tailored' scope." *Id.* (internal citations omitted); *see also Zapata*, 750 F.3d at 485.

## IV.

### A.

We first ask whether the complaint pleads facts that, if true, would permit the inference that Defendants are liable under § 1983 for an Eighth Amendment violation and would overcome their qualified immunity defense. We conclude that it does.

#### i.

The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This prohibition, made applicable to the States through the Fourteenth

Amendment,[5] *see Robinson v. California*, 370 U.S. 660, 666–67 (1962), "does not mandate comfortable prisons, but neither does it permit inhumane ones." *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). To plead an Eighth Amendment violation based on the conditions of an inmate's confinement, a plaintiff must allege conditions that "pos[e] a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The plaintiff must also allege that the defendant prison officials were deliberately indifferent to the inmate's health or safety. *Id.* This requires more than an allegation of mere negligence, but less than an allegation of purpose or knowledge. *Id.* at 835–36. Rather, a prison official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Whether a risk is substantial and the threatened harm is serious represents an objective test; whether prison officials consciously disregarded the risk represents a subjective one. *Ball*, 792 F.3d at 592. Furthermore,

---

[5] In their initial brief, Defendants argue that "[a] prison conditions claim by a prisoner convicted of a crime is governed by the Eighth and not the Fourteenth Amendment," and "[b]ecause the Complaint does not claim that Hinojosa was a pre-trial detainee, the Fourteenth Amendment claim should have been dismissed." Defendants misunderstand the complaint's invocation of the Fourteenth Amendment. The complaint invokes the Fourteenth Amendment simply because it is by that provision—and that provision alone—that the Eighth Amendment's guarantee applies against the States; the Eighth Amendment does not apply of its own force to the States. *See Robinson*, 370 U.S. at 666–67 (holding that the Fourteenth Amendment makes the Eighth Amendment's guarantee applicable against the States and concluding that the state law challenged in that case "inflicts a cruel and unusual punishment *in violation of the Fourteenth Amendment*") (emphasis added); *see also McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010) (noting that the Court has "held that incorporated Bill of Rights protections 'are all to be enforced against the States *under the Fourteenth Amendment* according to the same standards that protect those personal rights against federal encroachment'") (emphasis added) (quoting *Malloy v. Hogan*, 378 U.S. 1, 10 (1964)). Indeed, contrary to Defendants' argument, nothing in the complaint or in Plaintiff's briefs suggests any intention to bring a pre-trial detention conditions-of-confinement claim.

"[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (internal citation omitted).  For instance, "if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Id.* at 842–43 (internal quotation marks omitted).

We have held that exposing an inmate to extreme cell temperatures can constitute cruel and unusual punishment.  *See, e.g., Ball*, 792 F.3d at 592; *Gates v. Cook*, 376 F.3d 323, 339–40 (5th Cir. 2004); *Blackmon v. Garza*, 484 F. App'x 866, 869 (5th Cir. 2012); *see also Smith v. Sullivan*, 553 F.2d 373, 381 (5th Cir. 1977) (noting that the Eighth Amendment is implicated by "extremes of temperature that are likely to be injurious to inmates' health").  In *Gates*, we affirmed an injunction requiring state prison officials to provide ice water, fans, and daily showers when the heat index was 90°F or above.  376 F.3d at 339–40.  The evidence in *Gates* showed that "summer temperatures . . . average[d] in the nineties with high humidity," ventilation measures were inadequate to afford relief from the heat, "[t]he probability of heat-related illness [was] extreme," and inmates taking certain medications were especially susceptible to the heat.  *Id.* at 334.  In holding that the district court had properly identified an Eighth Amendment violation, we noted that an expert had testified that heat-related deaths were "very likely," and that a finding of

deliberate indifference was justified "based on the open and obvious nature of these conditions and the evidence that inmates had complained of symptoms of heat-related illness." *Id.* at 339–40.

Similarly, in *Blackmon,* we held that prison officials were not entitled to judgment as a matter of law where the evidence showed extreme temperatures in the facility, the plaintiff inmate was particularly susceptible to heat-related injury because of his age and medication, and the prison officials were aware of the danger but took arguably inadequate remedial measures.  484 F. App'x at 870–73.  Most recently, in *Ball,* we held that an injunction requiring heat-reduction measures was supported by an Eighth Amendment violation where an expert testified that the plaintiff inmates were particularly susceptible to the heat because of their medical conditions and treatments, and the evidence showed that during a monitoring period, the heat index at the facility ranged from 81.5°F to 107.79°F, with temperatures ranging from 78.26°F to 92.66°F. 792 F.3d at 596.  Prison officials had violated the Eighth Amendment even though they argued that no inmate at the subject facility "ha[d] ever suffered a heat-related incident" and the plaintiffs' "medical records show[ed] no signs of heat-related illness." *Id.* at 593.  This is because, "[t]o prove unconstitutional prison conditions, inmates need not show that death or serious injury has already occurred.  They need only show that there is a substantial risk of serious harm." *Id.* (internal quotation marks and citation omitted).

**ii.**

Here, the complaint alleges an Eighth Amendment violation.  The complaint alleges that Defendants subjected Hinojosa to dangerous heat conditions in conscious disregard of the serious risk that the heat posed for prisoners who, like Hinojosa, suffered from certain medical conditions, took certain medications, and had recently been transferred from air-conditioned jails to non-climate-controlled facilities.  As to conditions posing a substantial

risk of serious harm, the complaint alleges that temperatures in the Garza West Unit routinely exceeded 90°F, and even 100°F, and that Defendants' policies subjected inmates to these dangerous temperatures. It asserts that Hinojosa died in his cell in the early morning due to complications following a heatstroke, and that the temperature had risen above 100°F during the previous day. The complaint also alleges that inmates are provided "grossly inadequate amounts of water" to cope with the heat. These allegations plainly suffice to set forth conditions constituting a substantial risk of serious harm to inmates with medical conditions and prescriptions like Hinojosa's. *See Ball*, 792 F.3d at 594; *Gates*, 376 F.3d at 339–40; *Blackmon*, 484 F. App'x at 870–71.

Moreover, to support its claim that Defendants were aware of the heat risk and consciously disregarded it, the complaint alleges that from 2007 until Hinojosa's death, thirteen other men had died from heat-related causes in TDCJ prisons under similar circumstances, and TDCJ had previously been sued by inmates complaining of the heat.[6] Ten of these thirteen deaths occurred in 2011, the year before Hinojosa's. Furthermore, the complaint alleges that Defendants took no action despite their knowledge of these deaths, of the extreme temperatures in TDCJ facilities, of the vulnerability of recently transferred inmates with conditions and medications similar to Hinojosa's, and of the importance of timely intake physicals. It also alleges that TDCJ policies themselves recognized the risk of heat to inmates like Hinojosa, and

---

[6] The complaint refers to the following heat-condition cases brought by inmates: *Ruiz v. Johnson*, 37 F. Supp. 2d 855 (S.D. Tex. 1999), *rev'd and remanded sub nom. Ruiz v. United States*, 243 F.3d 941 (5th Cir. 2001); *Valigura v. Mendoza*, 265 F. App'x 232 (5th Cir. 2008); *Blackmon v. Kukua*, 758 F. Supp. 2d 398 (S.D. Tex. 2010), *rev'd and remanded sub nom. Blackmon v. Garza*, 484 F. App'x 866 (5th Cir. 2012). It also refers to a pending lawsuit, *McCollum v. Livingston*, No. 3:12-cv-2037 (N.D. Tex.), which arose from one of the deaths described in the complaint. In its order, the district court took notice that additional wrongful death lawsuits similar to the present one have been filed against TDCJ and Defendants, and it cited one of them, *Webb v. Livingston*, No. 6:13-cv-711 (E.D. Tex.).

No. 14-40459

Defendants provided training (albeit inadequate training) regarding extreme temperatures, suggesting their awareness of the risk.

The complaint specifically asserts that Thaler and Stephens routinely reviewed reports of heat-related injuries and deaths, discussing them in meetings with their deputies. According to the complaint, while Thaler and Stephens maintain that they remind regional directors and wardens to take heat-safety precautions, Thaler and Stephens in fact do no such thing. The complaint also asserts that Livingston personally approved cooling measures to protect the swine that TDCJ raises for slaughter, and Plaintiff argues that this allegation shows that Livingston was aware of the heat risk to inmates. The complaint also describes a letter that a state representative sent to Livingston, expressing concern about the high temperatures and asking that TDCJ take preventative measures.

These allegations, if true, would establish that Defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also dr[ew] the inference." *Farmer*, 511 U.S. at 837; *see also id.* at 842–43 (observing that deliberate indifference can be inferred merely from the obviousness of the risk, such as when prior incidents are pervasive or well-documented and circumstances suggest that the defendant was aware of them); *cf. also Ball*, 792 F.3d at 594–95 (holding that the defendants were aware of the risk posed by high temperatures even though they argued no inmate had ever suffered a heat-related incident at the subject facility). In any event, the open and obvious nature of the dangerously hot conditions would also support an inference of deliberate indifference. *See Gates*, 376 F.3d at 340.

Defendants argue that the complaint fails to plead deliberate indifference because it does not allege that they were aware of Hinojosa's specific medical history and needs. However, their lack of knowledge of

Hinojosa's individual susceptibility to heat-related dangers cannot defeat an Eighth Amendment claim.  The complaint alleges that Defendants were aware of the risk to recently transferred inmates with conditions and medications like Hinojosa's and yet took no action.  Prison officials cannot escape liability in a conditions-of-confinement case like this one by arguing that, while they allegedly were aware of and consciously disregarded a substantial risk of serious harm to a discrete class of vulnerable inmates, they were not aware that the particular inmate involved in the case belonged to that class.  *See Farmer*, 511 U.S. at 843 (in a case alleging prison conditions that created a risk of violence, holding that "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him *or because all prisoners in his situation face such a risk*") (emphasis added); *id.* at 844 (observing that where prison violence is widespread, "it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom"); *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (noting that the Eighth Amendment is implicated—and § 1983 liability may be triggered—when prison officials allow inmates to be exposed to infectious disease, "even though the possible infection might not affect all of those exposed").  Furthermore, even assuming *arguendo* that Defendants' ignorance of Hinojosa's medical history could be relevant, the complaint alleges dangerous conditions that we have previously held to be unconstitutional for general inmate populations.  *See Gates*, 376 F.3d at 339–40.

In sum, then, the complaint adequately alleges an Eighth Amendment violation based on Hinojosa's conditions of confinement.  Nevertheless, Defendants contend that the complaint does not properly allege *their responsibility* for the asserted constitutional violation because § 1983 does not contemplate supervisory liability.  They argue that they cannot be held liable

for the alleged failures of medical personnel and subordinate corrections officers because they did not personally participate in those failures.

The premise of Defendants' argument is undoubtedly correct. In *Monell v. Department of Social Services*, the Supreme Court held that claims against local governments premised on a theory of *respondeat superior* liability are not cognizable under § 1983. 436 U.S. 658, 691–94 (1978). Relying on *Monell,* "we have held that supervisory officials may not be found vicariously liable for the actions of their subordinates under § 1983." *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452 (5th Cir. 1994) (en banc); *see also Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) (citing *Monell* for the proposition that "§ 1983 does not give a cause of action based on the conduct of subordinates," and observing that "[p]ersonal involvement is an essential element of a civil rights cause of action"). Indeed, the Supreme Court squarely held in *Ashcroft v. Iqbal* that § 1983 claims against supervisory officials cannot be premised merely upon their knowledge of subordinates' actions. 556 U.S. 662, 677 (2009). Instead, under § 1983, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.*

But Defendants misread the complaint. The complaint does not seek to hold Defendants vicariously liable for the actions of their subordinates. Rather, it seeks to hold them liable for their own actions in promulgating—and failing to correct—intake and housing policies that exposed Hinojosa and other inmates like him to extreme temperatures without adequate remedial measures. "A supervisory official may be held liable . . . if . . . he implements unconstitutional policies that causally result in the constitutional injury." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (internal quotation marks omitted). To the extent that Defendants appear to argue they had no hand in the formation of the intake and housing policies described in the complaint, they raise a factual dispute inappropriate for resolution on a motion to dismiss.

No. 14-40459

The complaint specifically alleges that Defendants promulgated and had the power to change the policies that allegedly caused Hinojosa's death. Moreover, while it is true that the complaint contains allegations regarding the conduct of Defendants' subordinates, these allegations seek only to establish direct liability against those subordinates who were also named as defendants in the complaint, not vicarious liability against Livingston, Thaler, and Stephens.

### iii.

The complaint alleges facts that, if true, not only would establish Defendants' liability for an Eighth Amendment violation, but also would be sufficient to overcome a qualified immunity defense. "A public official is entitled to qualified immunity unless the plaintiff demonstrates that (1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation." *Porter*, 659 F.3d at 445. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al–Kidd*, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Our precedent clearly establishes that the Eighth Amendment guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate remedial measures. *See, e.g.*, *Gates*, 376 F.3d at 339–40; *Blackmon*, 484 F. App'x at 869; *see also Smith*, 553 F.2d at 381. In light of this precedent, a prison official acts unreasonably when he, either directly or through his policy, subjects an inmate to extremely dangerous temperatures without adequate remedial measures in conscious disregard of the risk posed by those temperatures.

Defendants argue, however, that the complaint cannot surmount the qualified immunity hurdle because there is no clearly established right to an

air-conditioned cell or to around-the-clock medical care. Defendants' argument again misreads the complaint and confuses right with remedy. While the complaint does allege that TDCJ cells are not air-conditioned and that TDCJ fails to employ medical staff during nighttime hours, it does not claim that the Eighth Amendment requires such accommodations. Rather, the right that it asserts is the right to be free from exposure to extremely dangerous temperatures without adequate remedial measures. The complaint's description of the lack of remedial measures does not purport to be an exhaustive list of the Eighth Amendment's basic requirements. It is simply a description of several ways in which Defendants could have addressed the risk, but instead chose not to do so. The right that it asserts, however, is the well-established Eighth Amendment right not to be subjected to extremely dangerous temperatures without adequate ameliorative measures.

Defendants also contend that the Supreme Court's recent decision in *Taylor v. Barkes*, 135 S. Ct. 2042 (2015), bolsters their qualified immunity argument. It does not. In *Barkes*, survivors of an inmate who committed suicide brought suit against, *inter alia*, the commissioner of the Delaware Department of Corrections and the institution's warden. *Id.* at 2043. When the inmate had arrived at the facility, a nurse administered an intake mental health evaluation, which revealed only two out of seventeen possible suicide risk factors. *Id.* Following established protocol, the nurse gave the inmate a routine referral to mental health services but did not activate any special suicide-prevention measures. *Id.* The inmate was placed alone in a cell and hanged himself the next day. *Id.* The plaintiffs claimed that the commissioner and warden violated the inmate's Eighth Amendment right "by failing to supervise and monitor the private contractor that provided the medical treatment—including the intake screening—at the Institution." *Id.* The Supreme Court held that the defendants were entitled to qualified immunity

because no decision of the Court "even discusses suicide screening or prevention protocols," the Third Circuit's own case law did not clearly recognize such a right, and other circuits had generally "suggested that such a right did *not* exist." *Id.* at 2044–45. In sum, the Court found, even if the alleged shortcomings existed, "no precedent on the books . . . would have made clear to petitioners that they were overseeing a system that violated the Constitution." *Id.* at 2045.

Here, by contrast, assuming Hinojosa's allegations to be true, our precedent put Defendants on notice that they were "overseeing a system that violated the Constitution." *Id.* Our circuit has made very clear that inmates have a right, under the Eighth Amendment, not to be subjected to extreme temperatures without adequate remedial measures, and Defendants have not alerted us to any contrary authority. *See, e.g.*, *Gates*, 376 F.3d at 339–40; *see also Smith*, 553 F.2d at 381; *Blackmon*, 484 F. App'x at 869. While we have not had occasion to give an exhaustive list of acceptable remedial measures, we have held that the provision of fans, ice water, and daily showers can suffice. *See Gates*, 376 F.3d at 339–40; *see also Ball*, 792 F.3d at 599 (approving remedies short of full air-conditioning such as the diversion of cool air from prison staff areas into inmate areas, allowing inmates to access air conditioning during specified times, and the provision of cool daily showers, cold ice water, personal ice containers, and individual fans).

A reasonable prison official in our circuit knows that during times of extreme heat, he must afford these remedies—or remedies like them—to satisfactorily address the risk of heat-related illnesses and fatalities. However, the complaint alleges that TDCJ did not provide enough drinking water or personal fans during times of extreme heat, and that the water that was provided was only lukewarm. The complaint also alleges that Defendants knew that prisoners such as Hinojosa were particularly vulnerable to the heat,

17

and that through the intake and housing policies that they promulgated, they failed to ensure that such prisoners received any meaningful relief. If true, this would defeat a qualified immunity defense, because it would establish that Defendants subjected Hinojosa to extreme temperatures without adequate remedial measures, in violation of our circuit's clearly established law.

**B.**

Having determined that the complaint's factual allegations, if true, would establish Defendants' liability for an Eighth Amendment violation and overcome a qualified immunity defense, we next ask whether further clarification of the facts was necessary for the district court to rule on the qualified immunity defense. We easily conclude that it was.

When reviewing a well-pleaded complaint and a defendant's motion to dismiss on the basis of qualified immunity, a district court may defer its qualified immunity ruling and order limited discovery when "the court remains 'unable to rule on the immunity defense without further clarification of the facts.'" *Backe*, 691 F.3d at 648 (quoting *Lion Boulos*, 834 F.2d at 507). In other words, a district court may elect the defer-and-discover approach "when the defendant's immunity claim turns at least partially on a factual question" that must be answered before a ruling can issue. *Lion Boulos*, 834 F.2d at 507.

Here, the district court held that it was unable to rule on Defendants' qualified immunity claim because factual development was needed as to their "knowledge, actions, omissions and/or policies in regards to TDCJ prison operations in times of extreme heat." In particular, the district court concluded that:

> [I]t is necessary to know when and how the TDCJ Defendants learned about specific prisoner deaths, including the death of Albert Hinojosa, and/or serious injury related to extreme heat; whether the TDCJ Defendants ordered that conditions be

monitored or a study conducted regarding extreme heat and inmate safety; their familiarity with Fifth Circuit case law addressing the dangers of heat within the context of the Eighth Amendment and whether or not policies were implemented or changed in accordance with such direction; whether the TDCJ has performed any studies into the costs of reducing extreme temperatures within the dorms via more efficient systems, engineering modifications, or other facility upgrades; whether the TDCJ Defendants personally consulted with UTMB officials in regards to the transportation and housing of at-risk inmates during the summer months; whether the TDCJ Defendants considered that at-risk inmates be maintained in air-conditioned facilities when in transport; and whether the TDCJ Defendants received copies of notes, memoranda, emails, or other correspondence from TDCJ wardens concerning heat-related issues at their units and any administrative responses thereto.

The district court considered these factual issues to be "particularly important when evaluating the second prong of the qualified immunity test—the reasonableness of the TDCJ Defendants' actions in light of the clearly established constitutional right to be free from extreme temperatures."

The factual questions of what Defendants knew, when they knew it, and whether they investigated and considered possible remedial measures, are undoubtedly necessary to answer before determining whether Defendants acted reasonably in light of clearly established law. Of course, as detailed above, Defendants' knowledge is central to the deliberate indifference element of Plaintiff's Eighth Amendment claim. However, their knowledge is also highly relevant to qualified immunity, because it bears heavily on the reasonableness of their actions.

As we recently observed in a similar interlocutory appeal from a district court's discovery order, the qualified immunity inquiry requires the district court to "evaluate whether [the defendants] acted with deliberate indifference by subjectively disregarding a known risk, and whether [their] actions were

objectively reasonable despite the alleged deliberate indifference." *Webb v. Livingston*, No. 14-40579, 2015 WL 4385287, at *5 (5th Cir. July 17, 2015) (unpublished) (internal citation omitted) (holding that a district court's defer-and-discover order in a similar wrongful death case against Livingston, Thaler, and Stephens complied with our precedent for issuing such orders, and dismissing for lack of jurisdiction). Furthermore, Defendants' "subjective knowledge is a question of fact, which this court has recognized is peculiarly within [their] knowledge and possession." *Id.* (internal quotation marks omitted); *see also Gates*, 376 F.3d at 333 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact . . . ."); *Schultea v. Wood*, 47 F.3d 1427, 1431 (5th Cir. 1995) (recognizing that the establishment of qualified immunity "depend[s] on facts peculiarly within the knowledge and control of the defendant" (quoting *Gomez v. Toledo*, 446 U.S. 635, 641 (1980)).

The qualified immunity defense requires the district court to determine whether Defendants acted reasonably at the time of the alleged constitutional violation, and "[t]his determination is complicated when, as here, the deliberate indifference standard must be reconciled with the second prong's objective reasonableness standard." *Webb*, 2015 WL 4385287, at *6. The reasonableness analysis must be different from the deliberate-indifference analysis, because "[o]therwise, a successful claim of qualified immunity in this context would require defendants to demonstrate that they prevail on the merits, thus rendering qualified immunity an empty doctrine." *Id.* (quoting *Hare v. City of Corinth*, 135 F.3d 320, 328 (5th Cir. 1998). "In light of these complexities, we have observed that '[a]dditional facts . . . are particularly important when evaluating the [reasonableness] prong of the qualified immunity test.'" *Id.* (quoting *Morgan v. Hubert*, 335 F. App'x 466, 473 (5th Cir. 2009). That holds true in this case. The district court did not err in

determining that factual development was needed to rule on Defendants' qualified immunity defense.

## C.

Our foregoing discussion establishes that the district court was empowered to defer its qualified immunity ruling and issue a discovery order. However, the breadth of the ordered discovery is critically important. Qualified immunity is immunity not only from judgment, but also from suit; "[o]ne of the most salient benefits of qualified immunity is protection from pretrial discovery." *Backe*, 691 F.3d at 648. We therefore must determine whether the discovery that the district court ordered was "narrowly tailored to uncover only those facts needed to rule on the immunity claim." *Id.* (quoting *Lion Boulos*, 834 F.2d at 507–08). While this presents a somewhat close question, we conclude that the district court's discovery order was appropriately tailored.

The district court ordered discovery "limited to the personal knowledge and personal conduct of each Defendant as it relates to Albert Hinojosa and the circumstances leading to his death." The district court elaborated that:

> Such discovery may include Defendants' knowledge of extreme temperatures at the Garza West Unit, including knowledge of any prisoner complaints to prison officials about the temperature in the dorms or cells for the months of May through September for the years of 2010, 2011, and 2012. Plaintiff may inquire as to each Defendant's personal knowledge, if any, in regards to the effects of extreme heat on pre-existing medical conditions of hypertension, diabetes, depression, and schizophrenia, whether Defendants are familiar with the medications generally prescribed to treat such conditions, and whether Defendants have knowledge or training concerning medications and extreme heat. Plaintiff may inquire as to any policies and procedures in place at the Garza West Unit, as well as TDCJ system-wide policies or procedures, adopted or in place to address prison operations when temperatures are considered to constitute extreme heat.

Defendants contend that this discovery is overbroad because it relates to a three-year period, encompasses system-wide TDCJ policies and conditions rather than those only at the Garza West Unit, and covers complaints by inmates without medical conditions like Hinojosa's. Defendants also seize on the discovery order's observation that factual development was necessary as to "whether the TDCJ Defendants considered that at-risk inmates be maintained in air-conditioned facilities when in transport," apparently interpreting this line to authorize discovery as to whether TDCJ inmate-transportation vehicles are equipped with air conditioning. Defendants also dismiss as "irrelevant" their general knowledge about prison heat, whether they conducted studies or consulted with UTMB officials, TDCJ policies regarding operations during extreme temperatures, when and how they learned of other inmate deaths, their familiarity with our precedent, their receipt of correspondence from wardens regarding heat-related issues, and whether policies were implemented or changed. Finally, Defendants contend that they have already provided "extensive discovery" in other similar cases, making the district court's discovery order unnecessary.

As a preliminary matter, we do not agree that the district court's order authorizes discovery regarding inmate transportation in TDCJ vehicles. The district court observed that discovery was needed to determine "whether the TDCJ Defendants personally consulted with UTMB officials in regards to the transportation and housing of at-risk inmates during the summer months," and "whether the TDCJ Defendants considered that at-risk inmates be maintained in air-conditioned facilities when in transport." In making this observation, the district court appears to have used the words "transportation" and "transport" to mean the movement of inmates into a transfer facility, such as the Garza West Unit, and then through the prison system. The

transportation of inmates in non-air-conditioned TDCJ vehicles has never been at issue in this case, and in any event, the district court's order never discusses the matter. Moreover, the complaint specifically alleges that inmates are most vulnerable when moved from air-conditioned county jails into non-climate-controlled transfer facilities, like the Garza West Unit, because of the temperature change and lack of opportunity to acclimatize. Viewed alongside the nature of the complaint's allegations, Defendants' strained reading of the district court's use of the words "transportation" and "transport" is mistaken.

We also disagree with Defendants' assertion that much of the ordered discovery was "irrelevant." The complaint sets out an Eighth Amendment claim by alleging deliberate indifference to dangerous heat conditions in TDCJ facilities. Assuming that the complaint's allegations are true, to be entitled to qualified immunity, Defendants must show either that they were not deliberately indifferent to the heat risk, or that their actions were reasonable in light of clearly established law. What Defendants knew about prison heat and its risks (especially for vulnerable inmates with medical conditions like Hinojosa's), when and how Defendants acquired such knowledge, whether Defendants investigated the risk and explored possible remedial measures, and whether Defendants adopted policies to respond to the heat risk are factual issues highly relevant to evaluating the reasonableness of Defendants' actions. In addition, we reject Defendants' contention that their provision of extensive discovery in other similar cases renders superfluous any discovery in the instant case. If anything, this fact cuts in the other direction, suggesting that the plaintiff in this case will similarly be able to discover a great deal of relevant material. Regardless, discovery for one plaintiff in one case is not

superfluous simply because other plaintiffs in other cases have had an opportunity to conduct it.[7]

Defendants' strongest argument concerns the discovery order's breadth and timeframe, inasmuch as it allows discovery regarding TDCJ system-wide policies or procedures and Defendants' knowledge of any inmates' heat-related complaints during a three-year period. Hinojosa died in the summer of 2012. With the exception of two inmate deaths dating back to 2007 and one other death in 2012, the other alleged inmate deaths all took place during the summer of 2011. In addition, the complaint focuses its allegations on TDCJ transfer facilities, like the Garza West Unit, where inmates typically arrive from air-conditioned county jails. However, the district court's order permits discovery not only into Defendants' knowledge of policies and procedures in place at the Garza West Unit and other similar transfer facilities, but also system-wide TDCJ policies and procedures. Furthermore, while the complaint focuses on Hinojosa's vulnerability to the heat due to his conditions and medications, the district court's order allows discovery regarding Defendants' knowledge of all inmates' heat-related complaints, not simply those of vulnerable inmates like Hinojosa.

Defendants advance a colorable argument that these discovery items are broader than necessary, but ultimately we are not persuaded. In a vacuum, the most relevant time period for discovery would seem to begin with the summer of 2011, during which ten TDCJ inmates allegedly perished from heat-related causes. However, we cannot say with any certainty that discovery into Defendants' knowledge of inmate complaints dating back to the summer of 2010 would be unnecessary. According to the complaint, by the summer of

---

[7] Nothing in our opinion should be construed to prevent Defendants from asking the district court to consolidate discovery proceedings with the discovery proceedings in other related cases.

2010, two inmates had already died from heat-related causes. Whether Defendants knew about inmate complaints during the summer of 2010 would shed light on the reasonableness of their actions. Likewise, while Defendants' knowledge of heat-related policies and procedures in place at the Garza West Unit and similar transfer facilities is more probative than their knowledge of policies and practices at other TDCJ facilities, we cannot say that discovery as to the latter is unnecessary. Defendants' knowledge of any heat-related TDCJ policy or procedure (or lack thereof) would bear on whether they acted reasonably in promulgating (or declining to change) the alleged policies for which the complaint seeks to hold them responsible. The same holds true for the district court's authorization to discover Defendants' knowledge of complaints by all inmates rather than simply complaints by those inmates with medical vulnerabilities. *See Gates*, 376 F.3d at 340 (observing that prior complaints by other inmates are probative of deliberate indifference). Both are relevant to the reasonableness of Defendants' actions, and we cannot say that discovery regarding the former—though perhaps less probative than the latter—is unnecessary.

To the extent we might have any lingering doubt about the breadth of the discovery order, we note that the district court was careful to state that discovery will be "limited to the personal knowledge and personal conduct of each Defendant as it relates to Albert Hinojosa and the circumstances leading to his death." This provides an outer boundary for all of the specific discovery items that follow, and those items should be interpreted with that boundary in mind. If Plaintiff requests discovery that is irrelevant to Defendants' knowledge and personal conduct regarding Hinojosa and the circumstances leading to his death, Defendants can seek enforcement of the plain language in the district court's order that prohibits such discovery.

No. 14-40459

## V.

Because, as set forth above, the district court's order complies with our precedent, we DISMISS this interlocutory appeal for want of jurisdiction. We express no opinion on how the district court should rule on Defendants' qualified immunity defense.

JONES, Circuit Judge, dissenting:

No one doubts the tragedy of a prisoner's life lost to heat stroke during a hot Texas summer.  The question here, however, is not whether better prison policies or procedures might theoretically have prevented Hinojosa's death in the Garza West transfer unit of the Texas Department of Criminal Justice ("TDCJ").  As in all cases of qualified immunity, the question is whether the three top officials of the TDCJ ("Executive Defendants"), whose 111 institutions supervise over 150,000 prisoners at a time, must endure litigation and potential personal liability in damages for this prisoner's death because of some arguably defective "condition of confinement."  *See Mullenix v. Luna*, 577 U.S. ___, 2015 WL 6829329 (Nov. 9, 2015) (summarily reversing Fifth Circuit denial of qualified immunity to police officer because his conduct did not violate clearly established law under the circumstances he confronted).  I would also reverse the district court order denying qualified immunity on the pleadings.  *See Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815 (1985) ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled *to dismissal* before the commencement of discovery.") (emphasis added).

The majority opinion here violates the clearly established law of qualified immunity by holding that under "clearly established" constitutional law, these officials may have been deliberately indifferent to the vaguely specified conditions under which Hinojosa succumbed.  This is because there is no allegation that they directly participated in any way in the management of this prison unit, and the plaintiff herself makes significant countervailing allegations about TDCJ policies, training, and procedures designed to address the risks of high temperatures. If the majority opinion is correct, then the top TDCJ officials might also be personally liable for any other injury-causing

No. 14-40459

"condition of confinement"—a salmonella outbreak in a prison unit's food service, the crash of a prison transport bus, a mishandled hurricane evacuation,[1] slippery prison showers, or even heart attacks or prison suicides.

The implications for suicide prevention would be obvious, except that the majority opinion is squarely at odds with the Supreme Court's decision in *Taylor v. Barkes*, which held *as a matter of law* that the top official of the Delaware prison system and the particular institution's warden violated no "clearly established law" by failing to oversee "proper implementation of adequate suicide prevention protocols." 135 S. Ct. 2042, 2044 (2015) (per curiam). In so doing, the Court overruled a Third Circuit decision denying summary judgment. Statistically, far more prisoner deaths are caused by suicide than heat stroke,[2] and the Court did not deny that generally, the prisons are responsible for the protection of inmates. *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970 (1994). Yet, the Supreme Court summarily reversed, holding that no court opinion has placed beyond doubt a prisoner's right to the proper implementation of adequate suicide prevention protocols, much less "identif[ied] any minimum screening procedures or prevention protocols that facilities must use." *Taylor*, 135 S. Ct. at 2044–45.

By the lights of *Taylor*, *Mullenix*, and many other Supreme Court decisions, the majority opinion is indefensible for two primary reasons. First,

---

[1] *Cf. Spotts v. United States*, 613 F.3d 659 (5th Cir. 2010).

[2] Hinojosa's complaint alleges that between 2007 and 2012, 13 TDCJ prisoners died of heat stroke (prior to Hinojosa's own death). During the period from 2001 to 2013, 326 prisoners died in TDCJ custody as a result of suicide—an average of approximately 25 deaths a year, more than eight times the average number of deaths per year alleged in this case (less than 3). *See* Margaret Noonan et al., U.S. Dep't of Justice, Mortality in Local Jails and State Prisons, 2000-2013 – Statistical Tables 25 tbl.25 (2015), *available at* http://www.bjs.gov/content/pub/pdf/mljsp0013st.pdf.

No. 14-40459

it defines the allegedly "clearly established right" of Hinojosa in an overbroad and ambiguous way, the antithesis of what qualified immunity stands for. Qualified immunity is due these officials as a matter of law. Second, it affords credence to pleadings that are insufficient under *Iqbal*[3] to raise a question about these officials' liability under any circumstances. The pleadings thus failed to state a claim under Rule 12(b)(6).[4]

## I. BACKGROUND

A brief synopsis of the relevant pleadings and the majority's characterization of the alleged constitutional violations is important. Hinojosa was transferred to the Garza West transfer unit, which houses well over 2,000 inmates, in August 2012. He was middle aged and obese and was under medication for hypertension, diabetes, and schizophrenia. Within two days of his arrival at this non-air conditioned facility, another prisoner in his dorm room observed him going into convulsions late at night and called for medical help. It took about two hours for "emergency" assistance to arrive, and Hinojosa was pronounced dead shortly thereafter. No facts are pled about remediation within the prison unit for heat conditions other than an alleged gross deficiency of drinking water and personal (not institutional) fans.

---

[3] *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).

[4] Additionally, the majority opinion condones abusive discovery that has already amassed thousands of pages of documents, plus depositions against these defendants, rendering their ultimate exoneration a hollow victory. This discovery far exceeds the case at hand, as it covers a lengthy time frame and the entirety of the TDCJ prison system. Qualified immunity, after all, is "*immunity from suit*, and extends beyond just a defense to liability to include all aspects of civil litigation." *Jacquez v. Procunier*, 801 F.2d 789, 791 (5th Cir. 1986); *see also Iqbal*, 556 U.S. at 685, 129 S. Ct. at 1953 ("The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including avoidance of disruptive discovery.") (internal quotation marks omitted).

No. 14-40459

Hinojosa's lawsuit included as defendants not only the three top officials of the TDCJ, appellants here, but also the head of the Correctional Managed Care Program at the University of Texas Medical Branch-Galveston, which is responsible for medical care of most TDCJ inmates, regional administrators, and wardens. Relevant to these top officials, the majority opinion culls from the plaintiff's pleadings as follows: TDCJ policies "reflect" the officials' knowledge that prisoners with medical conditions and treatment like Hinojosa's are unusually susceptible to excessive heat. TDCJ "policies" acknowledge the importance of acclimating inmates "to reduce the risk of heatstroke" as they transfer from air conditioned county jails to TDCJ, "but TDCJ did not have any housing assignment policy for newly arrived inmates to help them acclimatize [sic]." More precisely put, TDCJ "policies" specify that (a) newly arrived inmates with heat-sensitive conditions may not work or engage in recreation in high temperature conditions, and (b) no newly arrived inmates may labor outdoors until they have had an intake physical exam, which may not occur for up to ten days. "[T]hey are nonetheless housed in high indoor temperatures along with the rest of the inmate population." These defendants' "policies" made no accommodation for newly arrived inmates or inmates with heat-sensitive medical conditions. These defendants "failed to ensure that inmates timely received intake physicals, and failed to implement any other protective procedures." Livingston allegedly "took part in the decision not to employ medical staff at the Garza West Unit during night hours, and . . . all three supervisory Defendants were responsible for an alleged lack of adequate training that correctional officers received."

The majority omit mentioning many other allegations in the plaintiff's complaint directed to proving liability on the part of the medical defendants

30

No. 14-40459

and wardens who were situated closer to or at Garza West.  These telling allegations include:

- Dr. Owen Murray of the UTMB's Correctional Managed Care Program "oversees the medical, mental health and dental services provided to prisoners [in] . . . the Garza West Unit." (Pl.'s Compl. at ¶ 13.)

- "Murray is responsible for ensuring that TDCJ facilities serviced by UTMB provide adequate health care to prisoners, that prisoners have access to adequate health care, that infirmaries at units . . . are adequately staffed to handle medical conditions and emergencies that occur, and for formulating policies to ensure that prisoners receive adequate care, that serious medical needs are not treated with deliberate indifference, and that prisoners are not subjected to dangerous conditions as a consequence of their health issues and medical needs." (*Id.* at ¶ 31.)

- "Murray has not instituted any practice or policy concerning safely housing inmates known to be especially vulnerable to the heat." (*Id.* at ¶ 41.)

- "As the wardens and regional director, respectively, Guterrez and Kennedy are directly responsible for training the front-line officers charged with protecting prisoners' lives." (*Id.* at ¶ 73.)

- "[A]fter . . . two men died in 2007, Dr. Murray instituted no changes to UTMB's intake and housing practices, and

31

continued to leave vulnerable prisoners at risk of heat stroke system-wide." (*Id.* at ¶ 78.)

- "Despite . . . ten deaths in 2011, Dr. Murray and UTMB continued to house vulnerable inmates in extremely hot temperatures without any protections. And he did this knowing that some areas of TDCJ units, including at Garza West Unit, have air conditioned spaces available." (*Id.* at ¶ 89.)

According to the majority and the plaintiff, this is an Eighth Amendment "conditions of confinement" case in which liability is based on an objective standard of constitutionally inhumane prison conditions and a subjective standard embodying the defendants' deliberate indifference to those conditions. *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015). In such circumstances, it is unnecessary to demonstrate that top officials of TDCJ either personally participated in or knew about Hinojosa's imprisonment so long as they knew generally of the risk of high heat to particularly vulnerable prisoners. Consequently, according to the majority, these defendants are not being sued "in their supervisory capacity," but rather for "their own actions in promulgating—and failing to correct—intake and housing policies that exposed Hinojosa and other inmates like him to extreme temperatures without adequate remedial measures."

The defendants' qualified immunity defense is rejected by the majority because the "right that [the complaint] asserts . . . is the well-established Eighth Amendment right not to be subjected to extremely dangerous temperatures without adequate ameliorative measures." The majority concede that "[w]hile we have not had occasion to give an exhaustive list of acceptable

No. 14-40459

remedial measures, we have held that the provision of fans, ice water, and daily showers can suffice." *See Gates v. Cook*, 376 F.3d 323, 339–40 (5th Cir. 2004).[5]   The majority conclude that immunity cannot be awarded on the pleadings because "[a] reasonable prison official in our circuit knows that during times of extreme heat, he must afford these remedies—or remedies like them—to satisfactorily address the risk of heat-related illnesses and fatalities."   The majority finds sufficient to overcome qualified immunity the allegations that "Defendants knew that prisoners such as Hinojosa were particularly vulnerable to the heat, and that through the intake and housing policies that they promulgated, they failed to ensure that such prisoners received any meaningful relief."   In short, the Defendants, under these allegations "subjected Hinojosa to extreme temperatures without adequate remedial measures, in violation of our circuit's clearly established law."

The majority finally condone a long list of discovery inquiries allegedly relevant to how much these defendants knew about heat-related issues in TDCJ.   According to the majority, such discovery (which has already encompassed thousands of papers and depositions in similar pending cases) bears on defendants' knowledge, which is allegedly relevant both to their subjective states of mind and the objective reasonableness of their actions for liability and qualified immunity purposes.

## II.  QUALIFIED IMMUNITY

The panel majority should have proceeded along the same lines as the Court in *Taylor v. Barkes*.  In *Taylor*, the Third Circuit approached qualified

---

[5] *See also Ball*, 792 F.3d at 600 (approving remedies including diversion of cool air from prison staff areas, allowing inmates to access air conditioning during specified times, plus cool daily showers, cold ice water, personal ice containers, and individual fans). *Ball*, however, cannot be a basis for rejecting qualified immunity, because that opinion was issued in 2015, three years and more after the events here in dispute.

immunity by determining first that the plaintiffs had alleged a cognizable theory of supervisory liability, but the Supreme Court declined to consider that issue. *Taylor*, 133 S. Ct. at 2043. Instead, the Court reversed the lower court because "an incarcerated person's right to the proper implementation of adequate suicide prevention protocols" is not a clearly established constitutional right. *Id.* at 2044.

> *Taylor* succinctly expressed the basic standards for qualified immunity:
>
> "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* (brackets and internal quotation marks omitted). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al–Kidd*, 131 S. Ct. 2074, 2085 (2011) (internal quotation marks omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 2083.

135 S. Ct. at 2044 (parallel citations omitted). Here, as in *Taylor*, the Executive Defendants were neither plainly incompetent nor knowing lawbreakers. The alleged actions of the Executive Defendants were not objectively unreasonable in light of the clearly established law at the time of the violation, and they are entitled to immunity from suit.

The majority assert the right that was "clearly established" at the time of Hinojosa's death is the right to "be free from exposure to extremely dangerous temperatures without adequate remedial measures." This "right" is a tautology. Under this formulation, what "reasonable but mistaken judgment" could the Executive Defendants have made about what the law

requires?  *See al-Kidd*, 131 S. Ct. at 2085.  If this is the "clearly established right," then qualified immunity would cease to exist: if adequate remedial measures were in place, there would be no constitutional violation; if reasonable remedial measures fell short of being adequate, there would be liability.  *See Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) (en banc) ("Further, the Supreme Court has held that generalizations and abstract propositions are not capable of clearly establishing the law.")

This broad definition of the "clearly established right," which the majority opinion repeats three times in its discussion of qualified immunity and again in purporting to distinguish *Taylor*, is far more general than the precise policy deficiencies charged against the Executive Defendants—intake, housing, and medical policies geared to inmates with heat sensitive medical conditions.  Yet only "clearly established law" that is tailored to the specific facts confronted by a defendant suffices to deprive him of qualified immunity. *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct 596, 599 (2004) (per curiam) ("It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'") (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001)).

This overbreadth is a significant error in the majority's analysis.  The right to be free from extreme temperatures without adequate remedial measures is too generalized to be of any use to the Executive Defendants in deciding what actions they should or should not take regarding system-wide policies.  The qualified immunity doctrine is "highly context-sensitive." *McClendon v. City of Columbia*, 305 F.3d 314, 332 n.13 (5th Cir. 2002) (en banc) (per curiam).  And the Supreme Court has repeatedly and frequently instructed—recently with some exasperation—that courts should not "define clearly established law at a high level of generality."  *al-Kidd*, 131 S. Ct. at

2084. Instead, the right must be defined so that it is "beyond debate" that "every reasonable official would have understood that what he is doing violates that right." *Id.* at 2083 (internal quotation marks omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)). The Supreme Court's guidance underlines the real world implications of the qualified immunity analysis. General principles are of limited use to prison officials who must often make difficult policy choices in highly fact-dependent situations. Because reasonable mistakes are inevitable in these settings, the "clearly established" requirement protects mistaken judgments.

Here, it would not have been clear to a reasonable official in the position of the Executive Defendants that his conduct was unlawful in the situation confronted. Certainly it would not be "beyond debate" that the failure to establish specific intake, medical, or housing policies other than those in place when Hinojosa died would result in an Eighth Amendment violation. Assuming *arguendo* the majority's characterization of the right at issue, all that has been fairly established by this court's precedent is that in the face of high temperatures, some measures must be adopted to provide "relief," *Smith v. Sullivan*, 553 F.2d 373, 381 (5th Cir. 1977), including, in limited circumstances, extra fans, ice water, and daily showers,[6] *Gates*, 376 F.3d at 336. *But see Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995) (per curiam) ("While the temperature in extended lockdown may be uncomfortable, that alone cannot support a finding that the plaintiff was subjected to cruel and unusual punishment in violation of the Eighth Amendment.")

---

[6] Another case says prison officials should take steps to "address the risks of high heat." *See Blackmon v. Garza*, 484 F. App'x 866, 872 (5th Cir. 2012). But as an unpublished and non-precedential opinion, *Blackmon* supplies no clearly established law.

No. 14-40459

Further limiting these cases' applicability to the Executive Defendants' qualified immunity is that all were confined to particular inmates or particular sections of prisons. *Gates,* for instance, was an injunction limited to Mississippi's death row; *Smith* an injunction placed upon the El Paso County Jail. This distinction is critical because the Supreme Court has admonished that the clearly established law should generally be derived from cases that "squarely govern[]" the facts presented. *Brosseau*, 543 U.S. at 201, 125 S. Ct. at 600. Measures that are necessary or appropriate to address high temperatures at one prison unit may not be constitutionally required at another. Compare, at just one analytical level, the needs of medical units, low security units, and high security units. It makes no sense to extrapolate from a couple of fact-dependent prison conditions cases the constitutional requirements for TDCJ's policies covering its 111 statewide units. Indeed, even the majority opinion concedes there is no "exhaustive list of acceptable remedial measures" in prior cases, leaving only "remedies like them" as the vague constitutional baseline. In other words, not one of the housing and intake policies advocated in the complaint and the majority opinion are required or even mentioned in this court's clearly established law.[7] It is disingenuous to conclude that it would have been clear to any reasonable

---

[7] The plaintiff frequently complains about the lack of air conditioning in Garza West. (*See, e.g.*, Pl.'s Compl. at ¶ 35 ("Though extreme indoor temperatures at the Garza West Unit in the summer are well known to TDCJ and UTMB officials, TDCJ's leadership, including Kennedy, Stephens, Thaler, and Livingston, has taken no steps to air condition prisoner housing areas at the Garza West Unit.")). It is unlikely that such a remedy could be undertaken by the Executive Defendants without legislative approval due to the cost. In addition, to the extent this court's precedents speak about more comprehensive heat remedies, they reject that air conditioning must be installed to ensure cool prisons. *See Ball*, 792 F.3d at 599; *Blackmon*, 484 F. App'x at 872 n.6.

No. 14-40459

Executive Defendant that his conduct violated an established constitutional right.[8]

Moreover, the plaintiff's complaint demonstrates that the Executive Defendants acted reasonably under these circumstances. The complaint discusses that TDCJ policies recognized the risk of heat stroke. (*See* Pl.'s Compl. at ¶¶ 19, 48–50.) The complaint discusses that TDCJ training covers the risk of heat stroke. (*Id.* at ¶¶ 71–72.) The complaint avers that TDCJ policy requires the provision of a certain amount of water per day. (*Id.* at ¶ 60.) The complaint specifies that, under current policies, all prisoners arriving at Garza West were forbidden to labor outdoors until they had a physical exam, and those with heat-sensitive conditions could neither labor nor engage in recreation in high temperature conditions. (*Id.* at ¶¶ 65, 123.)

The plaintiff's mere dissatisfaction with the specificity and breadth of policy and training does not render the policies objectively unreasonable for the purposes of qualified immunity. *See, e.g.*, *Whitt v. Stephens Cty.*, 529 F.3d 278, 284 (5th Cir. 2008). The Supreme Court has cautioned against second-guessing the specificity and coverage of existing policy and training in the context of § 1983 damages actions because every time a state actor violates a constitutional right, "a § 1983 plaintiff will be able to point to something the [state] 'could have done' to prevent the unfortunate incident." *Connick v.*

---

[8] And this is "[a]ssuming for the sake of argument that a right can be 'clearly established' by circuit precedent despite disagreement in the courts of appeals." *Barkes*, 135 S. Ct. at 2045. Otherwise, any right "clearly established" in our case law must be compared against the pronouncements of other courts of appeals that have had occasion to consider hot temperatures in the prisons. *See, e.g.*, *Chandler v. Crosby*, 379 F.3d 1278, 1297–98 (11th Cir. 2004) (finding no constitutional violation where temperatures ranged from 80 to 95 degrees ("not unconstitutionally excessive") and the prison's remedial measures were a ventilation system, prison cells not in direct sunlight, prisoners not compelled to wear heavy clothing or perform laborious tasks, and prisoners with access to running water and a drinking cup).

No. 14-40459

*Thompson*, 131 S. Ct. 1350, 1363 (2011) (quoting *City of Canton v. Harris*, 489 U.S. 378, 392, 109 S. Ct. 1197, 1206 (1989)).

In fact, as the complaint recognizes, the state did do something to address potential adverse medical consequences of high temperatures:  these defendants rely on the University of Texas Medical Branch-Galveston in formulating policies and taking actions relating to the health and medical safety of prisoners.  (Pl.'s Compl. at ¶¶ 13, 15, 31, 143.)  Our case law allows prison officials to defer to medical professionals on a wide range of health issues.  *See, e.g.*, *Brauner v. Coody*, 793 F.3d 493, 501 (5th Cir. 2015).  Because our cases have sometimes held prison officers liable for *not* seeking professional medical attention for prisoners, few things seem *more* reasonable than relying on the judgment of a well-respected medical organization to address health and safety policies concerning the prevention and treatment of heat stroke.  *See, e.g.*, *Thompson v. Upshur Cty.*, 245 F.3d 447, 457–64 (5th Cir. 2001) (reviewing cases and holding that a jail official violated clearly established law by failing to "arrang[e] for professional medical assistance for . . . serious medical need"); *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (calling decisions to provide medical treatment a "classic example of a matter for medical judgment"); *see also Lee v. Young*, 533 F.3d 505, 511 (7th Cir. 2008) ("[I]n determining the best way to handle an inmate's medical needs, prison officials who are not medical professionals are entitled to rely on the opinions of medical professionals.").

It is not clearly established that TDCJ needed to have more specific policies regarding how to deal with heat-vulnerable prisoners during high heat conditions.  It is certainly reasonable for the Executive Defendants to rely on subordinates, be they doctors or wardens or prison guards, to take the necessary steps to address problems that arise on an individual or unit level.

No. 14-40459

*See Johnson v. Johnson*, 385 F.3d 503, 526 (5th Cir. 2004) ("Like all prison officials, these supervisory defendants have a duty to take reasonable measures to protect inmates. Yet given the size of the operation that they oversee, they cannot be expected to intervene personally" in every threat that arises.) (citation omitted). Without more definitive court rulings, it is not objectively unreasonable when prison policies and training exist to avert heat-related illness, but they ultimately prove inadequate to address every conceivable situation.

Contrary rules would implicate a core function of qualified immunity: government efficiency and effectiveness. *See Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S. Ct. 2727, 2736 (1982) (describing one of qualified immunity's chief concerns as "the diversion of official energy from pressing public issues"). Imagine if TDCJ's Executive Director had to personally oversee the amount and temperature of water afforded to prisoners at all 111 TDCJ facilities or else face the risk of personal liability. (*See* Pl.'s Compl. at ¶ 60 ("Throughout the system . . . the jugs did not contain enough water for each prisoner to drink enough to protect them from the heat, and are frequently filled with lukewarm water."). Such a rule would reduce government functioning to a crawl while high-level officials micromanaged their subordinates for fear that mistakes would subject them to "punitive and compensatory" judgments in federal court. (*See id.* at ¶¶ 8–10.)

This leads us back to *Taylor v. Barkes*, which should control this case, but which the majority confine to a dismissive paragraph. *Taylor* also originated in tragedy: a jail suicide. 135 S. Ct. at 2043. The plaintiffs sued the head of the Delaware Department of Corrections and the prison warden for failing to prevent the suicide by not properly supervising the medical personnel who administered the suicide screening protocol. *Id.* Denying summary

judgment, the Third Circuit found it clearly established that a "particular vulnerability to suicide" was a serious medical need encompassed within the Eighth Amendment. *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 328–29 (3d Cir. 2014), *rev'd sub nom.*, *Taylor*, 135 S. Ct. at 2044. The Third Circuit then pivoted to conclude that such a finding "place[d] it beyond debate that appropriate suicide-preventive measures are a required component of the Constitution's command that prison administrators provide adequate mental and physical health care for inmates." *Id.* at 329 (citation and internal quotation marks omitted).

A unanimous Supreme Court summarily reversed and granted qualified immunity as a matter of law. *Id.* at 2044. The Court held that even under Third Circuit precedent, a right "to the proper implementation of adequate suicide prevention protocols" was not clearly established. *Id.* The Court recognized that the Third Circuit's cases may establish that where prison officials "know . . . of the particular vulnerability to suicide of an inmate, they have an obligation not to act with reckless indifference to that vulnerability." *Id.* at 2045 (internal quotation marks omitted) (quoting *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 669 (3d Cir. 1988)). But such cases *did not* clearly establish "that detention facilities must implement particular procedures to identify such vulnerable inmates, let alone specify what procedures would suffice" or "identify any minimum screening procedures or prevention protocols that facilities must use." *Id.* In this light, the Court concluded, *"even if the* [*jail's*] *suicide screening and prevention measures contained the shortcomings that respondents allege, no precedent on the books . . . would have made clear to petitioners that they were overseeing a system that violated the Constitution."* *Id.* (emphasis added).

41

No. 14-40459

The parallels between *Taylor* and this case are obvious. Like the Third Circuit majority, the majority here affirm an Eighth Amendment right of medically vulnerable inmates not to be subjected to extreme temperatures without adequate remedial measures. Like the Third Circuit majority, the panel majority here approve a claim that these defendants were deliberately indifferent to the inmate's serious medical needs because their policies failed to provide certain "adequate remedial measures" or "measures like those" mentioned in prior circuit case law. Moreover, as in *Taylor*, it is alleged that the Executive Defendants knew their system was inadequate because thirteen other inmates died from heatstroke in five years before Hinojosa's death. The *Taylor* plaintiffs also explicitly alleged that the Delaware prison officials "were aware that the suicide rate in the Delaware prisons was above the national average." Third Am. Compl. at ¶ 54(i), *Barkes v. First Corr. Med., Inc.*, No. 06-104-LPS, 2012 WL 2914915 (D. Del. July 17, 2012).

The majority's analytical mistake in this decision is the same mistake made by the Third Circuit. Simply substituting "heat stroke" for "suicide" in the Supreme Court's language proves my point. Paraphrasing *Taylor*,

> [Fifth Circuit] cases may establish that where prison officials "know  . . . of the particular vulnerability to [heat stroke] of an inmate, they have an obligation not to act with reckless indifference to that vulnerability." *Taylor*, 135 S. Ct. at 2045 (internal quotation marks omitted). But that *does not* clearly establish "that detention facilities must implement procedures to identify such vulnerable inmates, let alone specify what procedures would suffice" or "identify *any* minimum screening procedures or prevention protocols that facilities must use." *Id.* (emphasis added). Thus, "even if [TDCJ's heat vulnerability and heat stroke] screening and prevention measures contained the shortcomings that respondents allege, no precedent on the books [in August 2012] would have made clear to petitioners that they were overseeing a system that violated the Constitution." *Id.*

42

No prior Fifth Circuit case comes close to giving these Executive Defendants fair notice that they needed additional system-wide housing, medical, or intake policies to avoid running afoul of the Constitution and exposing themselves to personal liability. This court should grant the Executive Defendants' motion to dismiss.

## III. SUFFICIENCY OF PLEADING EXECUTIVE DEFENDANTS' LIABILITY

Underlying all qualified immunity cases is the question "whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley*, 500 U.S. 226, 231–32, 111 S. Ct 1789, 1793 (1991). The plaintiff must assert the constitutional violation in a complaint containing "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)). A complaint consisting of "labels and conclusions" or "naked assertion[s] devoid of further factual enhancement" will not suffice. *Id.*, 129 S. Ct. at 1950 (alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555, 557, 127 S. Ct. at 1965–66). Instead the plaintiff must plead enough facts to "nudge[] [the] claims . . . across the line from conceivable to plausible." *Id.* at 680, 129 S. Ct. at 1951 (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1960).

To assert a violation of the Eighth Amendment for deliberate indifference to an inmate's health or safety, the plaintiff's complaint must plausibly allege that "prison conditions . . . pose[d] an unreasonable risk of serious damage" to the plaintiff and that prison officials "acted with deliberate indifference to the risk posed." *Ball*, 792 F.3d at 592 (internal quotation marks

omitted).  Deliberate indifference is not mere negligence; the plaintiff must allege more than that the Executive Defendants should have known about the risk.  *See Farmer*, 511 U.S. at 835–36, 114 S. Ct. at 1978.  Instead, the plaintiff must plead that the Executive Defendants actually knew about the risk and failed to respond reasonably in the face of it.  *See id.* at 844–45, 114 S. Ct. at 1982–83; *see also Johnson*, 385 F.3d at 544 ("Finally—and significantly . . .— there is no liability if the official responded reasonably to the risk, even if the harm ultimately was not averted.") (internal quotation marks omitted); *cf. Taylor*, 135 S. Ct. at 2045 (characterizing Third Circuit cases as holding that where prison officials "know . . . of the particular vulnerability to suicide of an inmate, they have an obligation not to act with reckless indifference to that vulnerability.").

Despite its length, the plaintiff's complaint here is rife with bare conclusional allegations against the Executive Defendants and irrelevant specific allegations.  The complaint fails to plead their knowledge of unconstitutional conditions at Garza West and in fact demonstrates that they acted reasonably to provide "adequate remedial measures."

A.  Generalized, conclusional allegations

The Supreme Court has made plain that, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677, 129 S. Ct. at 1949.  When the plaintiff's complaint uses blanket terms covering all the defendants, by lumping them together or calling them collectively "TDCJ," these allegations are properly disregarded unless the reference to the Executive Defendants can be clearly inferred.  *Accord. Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 & n.14 (11th Cir. 2015) (describing  this form of "shotgun pleading" as a "sin" consisting of "asserting multiple claims against multiple

defendants without specifying which of the defendants are responsible for which acts or omissions"). For instance, the plaintiff alleges that "Defendants provide grossly inadequate amounts of water to help prisoners survive the extremely-high temperatures indoors." (Pl.'s Compl. at ¶ 60.) It is not a plausible inference that TDCJ Executive Director Brad Livingston, all the way from his Huntsville office, personally provides grossly inadequate amounts of water to prisoners in Beeville, Texas. All such allegations should have been disregarded.

The complaint against the Executive Defendants depends on three propositions that they allegedly knew. First, excessive heat can be deadly.[9] Second, excessive heat can be even riskier for those with certain medical conditions.[10] Third, the Executive Defendants knew that it could be extremely hot in the units of the Texas prison system, including at Garza West.[11] These

---

[9] *See* Pl.'s Compl. at ¶ 18 ("As each of the Defendants have long known and discussed internally at high-level TDCJ and UTMB leadership meetings well before 2012, temperatures this elevated cause the human body to shut down."); *id.* at ¶ 94 ("Livingston, Thaler, [and] Stephens . . . knew extreme temperatures can be deadly.").

[10] *See* Pl.'s Compl. at ¶ 22 ("It was well known to TDCJ and UTMB leadership, including the Defendants, that people with certain medical conditions, like diabetes or hypertension, or who take certain medications, like antipsychotics or diuretics, are much more vulnerable to extreme temperatures."); *id.* at ¶ 37 ("Defendants TDCJ, Livingston, Thaler, [and] Stephens . . . know many prisoners have medical conditions that make the extreme heat deadly."); *id.* at ¶ 52 ("TDCJ and UTMB officials, including Livingston, Thaler, [and] Stephens . . . know prisoners in TDCJ custody suffer from these disabilities, and are at increased risk of heat-related injury and death."); *id.* at ¶ 67 ("To put it simply, TDCJ officials, such as . . . Thaler, Stephens, . . . and Livingston . . . know that TDCJ and UTMB fail to immediately identify prisoners with heat-sensitive medical conditions and know that this failure endangers prisoners[.]").

[11] *See* Pl.'s Compl. at ¶ 92 ("Livingston, Thaler, [and] Stephens . . . knew indoor temperatures in TDCJ facilities regularly exceeded 90 degrees during the hot Texas summers"); *id.* at ¶ 93 ("Livingston, Thaler, [and] Stephens . . . knew inmate living areas at the Garza West Unit were not air conditioned and that the apparent temperatures routinely skyrocketed during the hot Texas summers and routinely exceeded 90 degree indoors."); *id.*

bare accusations of knowledge are "not entitled to the assumption of truth." *See Iqbal*, 556 U.S. at 680, 129 S. Ct. at 1951 (rejecting a similar allegation that defendant "knew of [and] condoned . . . [the] harsh conditions of confinement") (internal quotation marks omitted).  In a case charging a former Texas prison director with liability for an inmate-on-inmate murder, this court long ago rejected similar allegations of knowledge and condonation, declaring that even when coupled with "conclusory allegations and . . . technical buzz words" they flunked the minimal pleading standard.  *See Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986) (Reavley, J.).  Thus, allegations that there was a substantial risk to vulnerable inmates from the heat and the Executive Defendants were aware of it merely track the elements of a deliberate indifference claim but do not alone suffice to allege an Eighth Amendment violation.  *See Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 ("A pleading that offers . . . a formulaic recitation of the elements of a cause of action will not do.") (internal quotation marks omitted).

The conclusory and threadbare nature of these allegations is to be expected, of course.  The Executive Defendants oversee an entity that houses, clothes, feeds, and cares for 150,000 people a day across 111 different facilities.  There is no allegation that the Executive Defendants played any direct role in the management of the Garza West unit, much less in Hinojosa's intake or incarceration.  *See id.* at 679, 129 S. Ct. at 1950 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").  That is the nature of large, complex organizations and the

---

at ¶ 97 ("Thaler, Stephens, and Livingston are aware that daily temperature readings are taken at the prison and that these readings are routinely above 90 [degrees] at all times during the summer months.").

No. 14-40459

reason why prisoner lawsuits are almost always directed at a unit's warden or individual guards, not the TDCJ Executive Director and his immediate subordinates. Because the Executive Defendants do not bear vicarious liability for the actions or inaction of subordinates, it is more challenging for a plaintiff plausibly to allege facts showing these defendants' deliberate indifference.

Consequently, this court has uniformly affirmed dismissal or otherwise rejected personal liability for high-ranking prison officials when knowledge is based only on system-wide problems. In addition to *Jacquez*, this court, in *Walker v. Livingston*, rejected a theory of Livingston's liability for an inmate's murder based on knowledge and condonation of systemic deficiencies. We concluded that there were no allegations of "any facts or any sort of knowledge on the part of these defendants that would suggest any reason to believe there was any likelihood of actual subjective awareness on their respective parts of the specific risk to [the plaintiff]." 381 F. App'x 477, 480 (5th Cir. 2010); *see also Lott v. Edenfield*, 542 F. App'x 311, 315 (5th Cir. 2013); *Hinojosa v. Johnson*, 277 F. App'x 370, 379 (5th Cir. 2008). In sum, allegations that the Executive Defendants knew generally of risks in the prison system from high temperatures do not make it plausible they were deliberately indifferent to the unconstitutional conditions in Garza West.[12]

B.  Specific Allegations

To shore up otherwise insufficient general allegations, the complaint relies on several facts designed to allow an inference of the Executive Defendants' deliberate indifference. First, thirteen other TDCJ prisoners died from heat stroke between 2007 and 2012. Second, several lawsuits have been

---

[12] This court's injunctive cases relating to prison heat conditions involved, unlike this case, executive defendants' personal knowledge of the adverse conditions and dangers to particular prisoners. *See, e.g.*, *Ball*, 795 F.3d at 594–95; *Gates*, 376 F.3d at 335.

pursued against TDCJ for alleged heat-related injuries.  Third, TDCJ policies recognize the risk of heat stroke.  Fourth, pigs receive more air conditioning than prisoners.  Fifth, a Texas state representative sent a letter to TDCJ in 2011 expressing concern about the high temperatures and asking that TDCJ take preventative measures.  Finally, as the majority opinion asserts, the "open and obvious nature of the dangerously hot conditions would also support an inference of deliberate indifference."

Arguably the most substantial factual allegation is that the Executive Defendants knew that thirteen other prisoners with various medical conditions died from heat stroke between 2007 and 2012.  According to the complaint, these deaths were "regularly discussed" at meetings attended by Thaler and Stephens (but evidently not Livingston).  Again, the complaint pleads little more than that the Executive Defendants "knew" a fact, instead of pleading how they knew and the significance of that knowledge.  *See Jacquez*, 801 F.2d at 792 (dismissing a complaint against Texas prison director where plaintiff "omit[ted] any explanation of how or in what way the defendants knew" of an imminent attack against one inmate) (internal quotation marks omitted).  That the deaths were "regularly discussed" at high-level meetings is nothing if not vague about the nature or extent of the discussion.  *See Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 443 (5th Cir. 2015) ("[S]ome allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross the line between the conclusory and the factual.") (alteration in original) (internal quotation marks omitted) (quoting *Peñalbert–Rosa v. Fortuño–Burset,* 631 F.3d 592, 595 (1st Cir. 2011)).

Even accepting that the Executive Defendants were aware of these deaths, this allegation lacks the context necessary to evaluate it.  In a prison system housing over 150,000 inmates at any given time, it is hardly plausible

that thirteen deaths over six years from a single cause raise awareness of a substantial risk to the inmate population.[13]  While we must view well-pleaded facts in the light most favorable to the plaintiff, this does not discharge the plaintiff's burden to provide the factual information and context necessary to evaluate his complaint.  *See, e.g., Burgis v. N.Y.C. Dep't of Sanitation*, 798 F.3d 63, 70 (2d Cir. 2015); *McTigue v. City of Chi.*, 60 F.3d 381, 383 (7th Cir. 1995) (statistics without context are "insufficient to satisfy even the loose requirements of notice pleading"); *cf. Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 312, 97 S. Ct. 2736, 2744 (1977) ("Statistics . . . come in infinite variety . . . .  Their usefulness depends on all of the surrounding facts and circumstances.") (brackets omitted) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340, 97 S. Ct. 1843, 1856–57 (1974)).

Relatedly, the complaint alleges that it is even more plausible that the Executive Defendants were deliberately indifferent to the danger to Hinojosa because he shared some medical characteristics with prisoners who had already died of heat stroke.  But the story here is mixed.  The complaint alleges that only four of the 14 decedents (including Hinojosa) were hypertensive and

---

[13] Statistics publicly available from the Justice Department indicate that between 2007 and 2012, almost 2,600 prisoners died while in TDCJ custody.  Including Hinojosa's death, this means that 0.5% of Texas prisoner deaths during this time period resulted from heat stroke.  *See* Noonan et al., *supra* note 2, at 25 tbl.25.  As noted above, during the period from 2001 to 2013, 326 prisoners died in TDCJ custody as a result of suicide and 54 as a result of homicide—an average of approximately 25 and 4 deaths a year, respectively, more than the average number of deaths per year alleged in this case (less than 3).  Yet, our precedents have emphasized that both suicide and violence are part of prison life.  *See Domino*, 239 F.3d at 756 (suicide); *Newton v. Black*, 133 F.3d 301, 307 (5th Cir. 1998) (violence).  Presumably, this court would not allow a plaintiff to plead that the Executive Defendants were deliberately indifferent to a personal threat to them of homicide or suicide based solely on these comparatively more common occurrences.

that three of the 14 were diabetic.[14]  Ten of the 14 (including Hinojosa) were prescribed a psychotropic drug and three of the 14 (not including Hinojosa) were prescribed a diuretic.  The ages of those who died ranged from 36 to 62, but Hinojosa was among the youngest at 44.  The places of death vary, too, including the Coffield Unit and Mitchell Units in Tennessee Colony (300 miles away from Garza West), several TDCJ locations in Huntsville (over 250 miles away), the Hodge Unit in Rusk (over 300 miles away), the Hutchins State Jail in Dallas (over 300 miles away), and the Connally Unit in Kenedy (30 miles away).  In short, no clear picture emerges from the profiles of the men who had already died.  Consequently, it is hardly plausible to draw the inference of the Executive Defendants' deliberate indifference to a prisoner in Hinojosa's position at Garza West.

The fact that TDCJ had been sued previously, and generally unsuccessfully, by inmates complaining of extreme temperatures does not create plausible inferences against these defendants.  We have held in a similar context that the assertions in pleadings are "not . . . particularly strong evidence" to show defendants' knowledge.  *Ball*, 792 F.3d at 595.  Furthermore, the cases the plaintiff discusses in the complaint are all distinguishable.  In *Valigura*, a lawsuit involving Garza East, this court indeed said that "temperatures into the nineties and hundreds are allegations that are sufficiently serious to" violate the Eighth Amendment.  *Valigura v. Mendoza*, 265 F. App'x 232, 236 (5th Cir. 2008) (per curiam).  A jury, however, apparently disagreed that those conditions existed at Garza East and rendered a complete

---

[14] It has been estimated that during a recent period under study approximately 19.2% and 4.2% of the male population of the Texas prison system are afflicted with hypertension and diabetes, respectively.  *See* Amy J. Harzke et al., *Prevalence of Chronic Medical Conditions Among Inmates in the Texas Prison System*, 87 J. Urb. Health 486, 491 tbl.1 (2010).

defense verdict after a two-day trial. *See* Jury Verdict at 1, *Valigura v. Mendoza*, No. 2:05-CV-513 (S.D. Tex. Aug. 19, 2008). Livingston himself was dismissed as a defendant in *Blackmon v. Kukua* because the district court found he had no knowledge of the extreme temperatures that were complained of. 758 F. Supp. 2d 398, 411 (S.D. Tex. 2010). In *Ruiz*, a decision reversed by this court, there is only a passing mention of expert testimony that heat was a danger. *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 904 (S.D. Tex. 1999), *rev'd and remanded sub nom.*, *Ruiz v. United States*, 243 F.3d 941 (5th Cir. 2001).

The remaining factual allegations fail to nudge this complaint toward plausibility. The fact that TDCJ policies recognized the risk of heat stroke does not mean that the Executive Defendants were deliberately indifferent to heat levels in the prisons. Cooling measures approved for TDCJ's swine herd add a melodramatic flair but are irrelevant to human inmates' conditions of confinement. And a letter from a single state representative "expressing concern" about high temperatures does not lead to an inference of knowledge, either. The complaint quotes from the letter that temperatures inside prison cells "do not fall below 100 degrees at night," but his charge is flatly contradicted by the plaintiff's own pleadings.[15] A letter containing dubious facts and otherwise just "expressing . . . concern" over prison conditions is too weak to support the proposition that unconstitutional conditions were such a pervasive problem that the Executive Defendants had actual notice of the substantial risk to Hinojosa.

Finally, the majority, perhaps recognizing the complaint's deficiencies, throw their hands up in the air: "In any event, the open and obvious nature of

---

[15] *See* Pl.'s Compl. at ¶ 139 ("Though it was late at night when Hinojosa suffered the heat stroke, the indoor heat index was still 92 degrees.").

the dangerously hot conditions would also support an inference of deliberate indifference." This is ordinarily the language of negligence, not deliberate indifference. A cognizable Eighth Amendment claim arises only if the Executive Defendants acted unreasonably in the face of "open and obvious" conditions. *Cf. Farmer*, 511 U.S. at 843–44, 114 S. Ct. at 1982–83. And reasonable measures, even if ultimately inadequate to prevent the injury, do not support a finding of deliberate indifference. *See Johnson*, 385 F.3d at 526. As I explained in the discussion of qualified immunity, the plaintiff's own pleadings acknowledge that reasonable measures had been taken to prevent heat-related injuries: prisoners at Garza West could not perform outdoor labor before they had intake physicals; prisoners vulnerable to heat could not labor outdoors or engage in recreation before they had intake physicals; management of prison health measures was delegated to the professional medical oversight of the UTMB-Galveston; and extra water (though allegedly in inadequate quantities) was prescribed during hot conditions.

When a court evaluates the legal sufficiency of a complaint, it reviews the allegations holistically, as alleged facts are all judicial admissions. *See Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ.*, 579 F.3d 546, 550 (5th Cir. 2009). The facts pled here should preclude a deliberate indifference claim against the Executive Defendants because the complaint includes reasonable policy measures to avert the very injury suffered by Hinojosa. *See Brauner*, 793 F.3d at 499, 502 (holding there was no deliberate indifference on the part of prison officials where the plaintiff's own pleadings were "replete with examples of attentive and varied treatment from his physicians" and "supervisory diligence" on the part of the assistant warden).

A final irony proves the injustice of footing this claim on broad allegations about the Executive Defendants' (a) knowledge of "open and

obvious" dangers from excessive heat in the prisons and (b) failure to implement more policies and training. The majority is allowing potential liability on a more lenient basis than would be required for the actual treatment Hinojosa received at Garza West. In an inmate suicide case, this court granted qualified immunity to the treating physician while carefully noting the critical difference between medical malpractice and Eighth Amendment deliberate indifference:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* Furthermore, the decision whether to provide additional treatment "is a classic example of a matter for medical judgment." *Estelle* [*v. Gamble*, 429 U.S. 97, 107, 97 S. Ct. 285, 293 (1976).]

*Domino*, 239 F.3d at 756.

How can it be that the standards for imposing liability on the Executive Defendants have become, in the majority's eyes, easier to meet than those for imposing liability on the medical staff or duty guards? Especially after *Iqbal*, the plaintiff has not provided the careful factual allegations to meet the burden of pleading, with plausibility, that three of the highest-ranking officials in the Texas prison system were deliberately indifferent to Hinojosa's vulnerability to heat in the conditions he faced at Garza West.

I dissent.